**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | | |
|---|---|---|
| **Barbara Riddle,** | ) | **Civil Action No.:__________** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **COMPLAINT** |
| | ) | |
| **American Express National Bank,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | |
| ________________________________ | ) | |

**COMPLAINT**

1. This is an action brought by Plaintiff, Barbara Riddle, for actual, statutory and punitive damages, attorneys' fees, and costs for Defendant's violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*, (hereinafter "FCRA"). Plaintiff also seeks compensatory and punitive damages for Defendant's violations of South Carolina common law set forth herein.

2. The FCRA exists to protect consumers' privacy and to impose upon those who trade in consumers' private information strict requirements to ensure that the information they report is as accurate as possible.

3. Before the enactment of the FCRA, inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517 (1969).

4. To accomplish Congress' goals, the FCRA contains a variety of requirements to protect consumers, including §§ 1681e and 1681s-2(b), which are two of the cornerstone provisions of the FCRA.

5. One of the primary purposes of the FCRA is to assure "maximum possible accuracy" of consumer information to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

6. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home*. *We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

## <u>JURISDICTION AND VENUE</u>

7. This Court has Jurisdiction under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681p, and 28 U.S.C. §§1331, 1332, and 1367.

8. Venue is proper in the Florence Division because the Plaintiff resides in Darlington County and the Defendant transacted business in this division.

**PARTIES**

9. Plaintiff, Barbara Riddle, is a resident and citizen of the State of South Carolina, Darlington County, and is over the age of twenty-one (21) years. Plaintiff is a consumer as that term is defined by the FCRA, 15 U.S.C. §1681a(c).

10. Defendant American Express National Bank, ("AMEX") is a national banking association organized and existing under the laws of the United States of America and headquartered in Sandy, Utah, that may be served with process through its CEO, Stephen J. Squeri, at its corporate headquarters located at 115 West Towne Ridge Parkway, Sandy, Utah 84070. Defendant provides banking services and credit cards accounts throughout South Carolina and was in all respects and at all times relevant herein doing business in the state of South Carolina and this Division.

11. Defendant is a furnisher of information to multiple Consumer Reporting Agencies ("CRAs"), including Equifax, Experian, and TransUnion, in that it regularly reports account data regarding consumer credit cards to the CRAs.

**FACTUAL ALLEGATIONS**

12. In April 2024, Plaintiff became the victim of identity theft when an unknown third party opened an American Express credit card account, account ending *6083, (hereinafter the "Account") in her name without her knowledge or permission.

13. On or about May 2, 2024, Plaintiff received a credit card in the mail from Defendant. Plaintiff immediately contacted Defendant and informed them she did not open the

Account. Thereafter, Plaintiff mailed the original credit card back to Defendant.

14. On or about June 18, 2024, Defendant sent Plaintiff a letter stating her inquiry regarding the disputed Account was currently under investigation by the U.S. Fraud Department and that Defendant would notify her in writing when that investigation was complete.

15. On or about July 26, 2024, Defendant sent Plaintiff a letter in response to her dispute regarding the Account informing Plaintiff that it was unable to accept her claim since they determined the Plaintiff "did apply for this account." Defendant did not provide Plaintiff any information or documents it had allegedly reviewed to make this determination.

16. In response, Plaintiff handwrote on Defendant's July 26, 2024, letter, that she never had the Account and that she never signed for the Account. Plaintiff also informed Defendant that she would not worry about this anymore. Plaintiff mailed the letter back to Defendant.

17. On or about August 5, 2024, Defendant sent Plaintiff a letter informing Plaintiff that her inquiry regarding the Account was currently under investigation by the U.S. Fraud Department and would notify her in writing when that investigation was complete.

18. On or about September 11, 2024, Defendant notified Plaintiff that it rejected her claim of fraud because it had determined that Plaintiff applied for the Account. Defendant did not provide Plaintiff any information or documents it had allegedly reviewed to make this determination.

19. Despite Plaintiff's numerous communications with Defendant informing it the Account was fraudulent, on October 5, 2024, Defendant sent Plaintiff a collection letter

stating the Account was past due and demanding a payment of $270.11.

20. On or about November 4, 2024, Defendant sent Plaintiff a collection letter stating that the total due was $632.32. Defendant specifically informed Plaintiff that payment was required to avoid referral of the Account to an attorney in Plaintiff's area.

21. On or about November 21, 2024, Defendant sent Plaintiff a letter stating that the Account had been cancelled.

22. On or about November 22, 2024, Defendant sent Plaintiff a right to cure stating that she must pay $270.11 by December 6, 2024.

23. On or about January 3, 2025, Plaintiff began receiving collection letters from Lloyd & McDaniel, PLC, a debt collector, stating that $10,556.41 was due.

24. On or about March 2, 2025, Plaintiff received a letter from Defendant acknowledging that Plaintiff had recently advised them she was the victim of identity theft and requested documentation on the Account, including a copy of the application. In its letter, Defendant informed Plaintiff the original Account was applied for electronically and therefore, no paper application with a signature was available. Accordingly, Defendant stated it could only provide a listing of the information that was given at the time the application was made. Defendant informed Plaintiff that if she wanted to receive that information, she would need to provide them with a copy of her photo identification and a copy of a police report. This was the first time Defendant had ever requested proof of Plaintiff's identity and a police report.

25. On March 14, 2025, Plaintiff filed a police report with the Darlington County Sheriff's Office regarding the theft of her identity. Plaintiff specifically identified the

American Express Account as having been fraudulently opened in her name.

26. On March 15, 2025, Plaintiff signed Defendant's March 2, 2025, letter, and mailed it back to Defendant with a copy of her police report and driver's license.

27. On or about March 18, 2025, Defendant sent Plaintiff a letter acknowledging that she had disputed the Account. Defendant informed Plaintiff to call them at the number on the back of "your Card." At the time Defendant send this letter, it knew or should have known that Plaintiff did not have the card as she had already returned the card to Defendant.

28. On or about March 20, 2025, Defendant sent Plaintiff another letter stating ger dispute was currently under investigation by the U.S. Fraud Department. Defendant requested that Plaintiff complete and sign the enclosed Identity Theft Declaration and return it to them by April 4, 2025.

29. On or about April 4, 2025, Plaintiff responded to Defendant's March 18, 2025, letter by writing on the letter itself, "I don't have a card. When it arrived I mailed it back to you as it wasn't mine!" Plaintiff also wrote, "If this isn't enough please send me what you have as I was not involved in this transaction and it is not good to keep sending me bills that are not mine!" Plaintiff returned her written response on Defendant's letter, along with the Identity Theft Declaration requested by Defendant.

30. In April 2025, Plaintiff contacted the CRAs, Trans Union, Equifax, and Experian and placed a credit freeze on her credit files. At that time, Plaintiff also requested copies of her credit reports.

31. On or about April 17, 2025, in response to receipt of Plaintiff's police report and proof of identity, Defendant sent Plaintiff a letter enclosing "duplicate" copies of the

Account statements from May 2, 2024, through April 2, 2025. The May 2, 2024, statement showed a charge made on April 8, 2024, in the amount of $9,350.00 to "Launchpad Group" in Lynwood, Washington. Plaintiff did not make or authorize that charge. The statement also listed an Annual Membership Fee of $650.00 charged on May 2, 2024. As a result, the total balance due on the Account was $10,000.00.

32. The April 2025 Statement showed a total amount due of $10,556.41, which included late fees and interest added to the fraudulent Account.

33. On or about April 29, 2025, Defendant sent Plaintiff a letter stating the Account was significantly past due and, as a result, Defendant had transferred the Account to Lloyd & McDaniel, PLC, a debt collector, for collection.

34. On or about April 29, 2025, Trans Union sent Plaintiff a letter confirming that the credit freeze had been placed on Plaintiff's Trans Union credit report, but did not provide Plaintiff with a copy of her credit report.

35. On or about April 29, 2025, Experian sent Plaintiff a letter confirming that the credit freeze had been placed on Plaintiff's Experian credit report. However, Experian did not provide Plaintiff with a copy of her credit report.

36. On or about April 29, 2025, Equifax sent Plaintiff a letter confirming that the credit freeze had been placed on Plaintiff's Equifax credit report.

37. On or about June 9, 2025, Plaintiff, with the help of her daughter, went online to www.annualcreditreport.com and attempted to obtain a copy of her credit report from Trans Union. Unfortunately, Plaintiff's request was denied.

38. However, on that same day, Plaintiff was able to obtain a copy of her Equifax credit

report. Upon review of her Equifax credit report, Plaintiff discovered that Defendant was reporting the fraudulent Account as a derogatory account, belonging to her. Specifically, the Account was reporting as opened on April 2, 2024, 120 days past due, with a balance due of $10,556, and closed on November 21, 2024.

39. On or about June 20, 2025, Plaintiff sent a dispute letter to Trans Union **("First Trans Union Dispute")**. Plaintiff informed Trans Union that she had been the victim of identity theft in April of 2024, and discovered the Account was reporting on her credit reports as a derogatory account. Plaintiff specifically disputed the Account as a fraudulent account opened in her name without her knowledge or permission. Plaintiff also disputed the reporting of any hard inquiries by Defendant and requested Trans Union remove them from her credit report. Upon receipt, Trans Union forwarded Plaintiff's dispute to Defendant, but did not provide Defendant's response to Plaintiff.

40. On or about June 20, 2025, Plaintiff sent a dispute letter to Experian **("First Experian Dispute")**. Plaintiff informed Experian that she had been the victim of identity theft in April of 2024, and discovered the Account was reporting on her credit reports as a derogatory account. Plaintiff disputed the Account as a fraudulent account opened in her name without her knowledge or permission, and requested Experian remove the Account if it was reporting on her Experian credit report. Plaintiff also disputed the reporting of any hard inquiries by Defendant and requested Experian remove them from her credit report. Finally, Plaintiff requested Experian confirm that a fraud alert was currently on her Experian credit file. Experian received Plaintiff's First Experian Dispute on July 2, 2025, and thereafter forwarded same to Defendant.

41. On or about June 20, 2025, Plaintiff sent a dispute letter to Equifax **("First Equifax Dispute")**. Plaintiff informed Equifax that she had been the victim of identity theft in April of 2024, and an Account had been fraudulently opened in her name without her knowledge of permission. Plaintiff disputed the Account as a fraudulent account opened in her name without her knowledge or permission. Plaintiff also disputed the reporting of a hard inquiry by Capital One Bank USA NA, which occurred on April 2, 2024, as she had not applied for credit with Capital One Bank. Equifax received Plaintiff's First Equifax Dispute on July 1, 2025, and thereafter forwarded same to Defendant.

42. On June 24, 2025, Defendant filed a collection lawsuit against Plaintiff in the Darlington County Court of Common Pleas.

43. As a result of that collection lawsuit, Plaintiff was forced to retain an attorney to defend her and incurred attorney fees. Additionally, Plaintiff's good name and reputation were publicly impugned by Defendant stating she had failed to pay a bill when Defendant knew or should have known the Account was fraudulent as it had already received Plaintiff's Identity Theft Declaration and police report.

44. At the time Plaintiff filed her Answer to Defendant's collection lawsuit, she specifically disputed the Account as fraudulent and attached a copy of her police report to the Answer.

45. After receiving Plaintiff's Answer and police report, instead of dismissing the collection lawsuit, Defendant continued to prosecute its claim against Plaintiff by filing a Motion for Summary Judgment.

46. Additionally, throughout the course of the collection lawsuit, with full knowledge

of Plaintiff's claim of fraud and receipt of Plaintiff's police report, Defendant continued to report the Account as belonging to Plaintiff to the CRAs, debt collectors, and the public at large.

47. Furthermore, in response to ACDVs from the CRAs, Defendant continued to verify the Account as reporting accurately, despite Defendant's knowledge that it did not have any information to support that Plaintiff actually opened the Account.

48. On or about July 1, 2025, Equifax sent Plaintiff a letter stating it had received Plaintiff's request for a fraud alert, but informed Plaintiff they needed additional information to verify Plaintiff's identity and address. Equifax requested Plaintiff send them a letter including her full name, any former names, current and former addresses, and date of birth. Equifax also requested Plaintiff send copies of documents verifying her identity and address.

49. On July 3, 2025, Defendant responded to Trans Union's ACDV by verifying the Account as belonging to Plaintiff and reporting accurately. As a result, the Account continued to be reported on Plaintiff's Trans Union credit report.

50. On or about July 3, 2025, Defendant sent Plaintiff a letter in response to Plaintiff's "recent inquiry to the consumer reporting agency" concerning Defendant's "reporting of your American Express account…." In its letter, Defendant stated they had not received sufficient information for their Fraud Department to conduct a reasonable review of Plaintiff's claim and therein provided a list of items from which Plaintiff could check to provide additional information. Plaintiff checked the box indicating she did not authorize anyone to use her name or personal information to seek the money, credit, loans, goods or

services, and the box that she had not received any benefit, money, goods or services through use of an American Express product. Plaintiff then returned the letter to Defendant.

51. On or about July 3, 2025, Equifax sent Plaintiff a letter stating it had received her request to add a one-year fraud alert, but again informed Plaintiff she would need to provide her full name, former names, current and former addresses, and date of birth, along with copies of documents verifying her identity and address, before Equifax would add the extended fraud alert to her credit report.

52. On or about July 3, 2025, Equifax sent Plaintiff a second letter stating it had received her recent dispute regarding the Account, but their records indicated a dispute was currently in process.

53. On or about July 17, 2025, Defendant sent Plaintiff a letter informing Plaintiff her recent inquiry of the Account was under investigation by the U.S. Fraud Department and Plaintiff would be notified in writing upon completion of that investigation.

54. On or about July 17, 2025, Defendant sent a second letter to Plaintiff thanking her for alerting it to the fraudulent use of her identity. However, Defendant claimed it was unable to fulfill Plaintiff's request for documents as it had not received the required information from Plaintiff. Defendant's letter asked Plaintiff to provide the "item(s) checked below," but nothing was checked. At the time Defendant sent this letter it had already received a copy of Plaintiff's ID, her Identity Theft Declaration, and her police report.

55. On or about July 23, 2025, Experian sent Plaintiff its Dispute Results, wherein Experian informed Plaintiff that Defendant had verified the Account as reporting

accurately and updated the Account information that was unrelated to Plaintiff's dispute. Accordingly, Experian continued to report the derogatory Account as belonging to Plaintiff on her Experian credit reports.

56. On or about July 24, 2025, Defendant sent Plaintiff a letter stating it had reviewed "its records" and was unable to accept Plaintiff's claim of fraud. Defendant did not provide Plaintiff any information or documents it had allegedly reviewed to make this determination.

57. On or about August 5, 2025, Defendant sent Plaintiff a letter stating her inquiry was currently under investigation by the U.S. Fraud Department and that they would notify her in writing upon completion of their review.

58. On or about August 13, 2025, Plaintiff sent a second dispute letter to Trans Union **("Second Trans Union Dispute")**. In her letter, Plaintiff alerted Trans Union she had not received a response to her First Trans Union Dispute. Plaintiff again informed Trans Union that she had been the victim of identity theft and that the Account had been fraudulently opened in her name without her knowledge. Finally, Plaintiff informed Trans Union she had learned the identity thief had attempted to open other accounts in her name. Plaintiff specifically disputed the reporting of the Account as fraudulent and asked that it be removed from her credit report. Plaintiff also disputed any hard inquiries by American Express, or any other creditors, occurring in April of 2024, as fraudulent and asked they be removed. Lastly, Plaintiff again requested Trans Union send her a full copy of her credit report. Trans Union received Plaintiff's Second Dispute on August 26, 2025, and thereafter forwarded same to Defendant.

59. On or about August 13, 2025, Plaintiff sent a second dispute letter to Experian **("Second Experian Dispute")**. In this letter, Plaintiff informed Experian she had received the results of Experian's reinvestigation into her dispute, but the Account continued to be reported on her credit report. Plaintiff again informed Experian she was the victim of identity theft and that the Account was fraudulently opened in her name. Plaintiff requested Experian remove the fraudulent Account from her credit report. Plaintiff also disputed several fraudulent hard inquiries which all occurred in April of 2024. Experian received Plaintiff's Second Dispute on August 26, 2025, and thereafter forwarded same to Defendant.

60. On or about August 13, 2025, Plaintiff sent a second dispute letter to Equifax **("Second Equifax Dispute")**. In this letter, Plaintiff again specifically disputed the Account as fraudulent. Plaintiff also disputed the hard inquiry by Capital One Bank USA NA on April 2, 2024, as fraudulent. With her letter, Plaintiff provided Equifax a copy of her Social Security card and driver's license. Upon receipt of Plaintiff's dispute, Equifax forwarded same to Defendant.

61. On or about August 14, 2025, Defendant forwarded Plaintiff the information that was allegedly used to apply for the Account, which included Plaintiff's name, address, date of birth, and social security number.

62. On or about August 16, 2025, Defendant sent Plaintiff a "duplicate" copy of the Account statement with a closing date of May 2, 2024, showing a $9,350 charge to Launchpad Group on April 8, 2024, and a $650 Annual Membership Fee on May 2, 2024.

63. On or about August 17, 2025, Defendant sent Plaintiff a letter stating that Plaintiff's recent inquiry was under investigation by the U.S. Fraud Department and Defendant would

notify Plaintiff in writing upon completion of that review.

64. On or about August 27, 2025, Trans Union sent Plaintiff a letter stating their records showed a previous investigation of the Account had been completed by them and the Account was verified by Defendant as belonging to Plaintiff. Accordingly, Trans Union refused to investigate Plaintiff's second dispute.

65. On or about September 2, 2025, Defendant sent an Account statement to Plaintiff with a balance of $10,556.41, a minimum payment due of $515.78, and a payment due date of September 27, 2025. The statement also noted "Your billing inquiry is under investigation. No payment on the amount under review of $10,040.63 is required at this time. Please pay at least the Minimum Payment Due, which does not include the amount under review."

66. At the time Defendant sent the Account statement, Defendant knew the entire Account and balance was disputed as fraudulent.

67. On or about September 6, 2025, Equifax sent Plaintiff its Investigation Results, wherein Equifax stated the disputed Account and disputed hard inquiry were not currently reporting on Plaintiff's Equifax credit file. However, Equifax did not provide Plaintiff a copy of her credit report so she had no way of verifying that the disputed fraudulent items were actually removed from her credit report.

68. On or about September 28, 2025, Defendant sent Plaintiff a letter stating it had reviewed its records and rejected Plaintiff's claim of fraud because it had determined Plaintiff applied for the Account. Defendant did not provide Plaintiff any information or documents it had allegedly reviewed to make this determination.

69. On or about October 2, 2025, Defendant sent an Account statement to Plaintiff with a balance of $10,556.41, a minimum payment due of $738.96, and a payment due date of October 27, 2025. The statement noted "This statement is for information purposes only. This is not a bill. Please contact your collections agency for account information. Disregard the Minimum Payment Due, your Account is in default and the balance is due in full."

70. At the time Defendant sent the Account statement, Defendant knew the entire Account and balance was disputed as fraudulent.

71. On or about October 29, 2025, Plaintiff sent a third dispute letter to Trans Union ("**Third Trans Union Dispute**"). In this letter, Plaintiff again specifically disputed the Account as fraudulent and asked Trans Union to remove it from her credit report. In addition, Plaintiff requested Trans Union remove any hard inquiries made in April of 2024 by Defendant or any other entity, as she did not apply for any credit at that time. With her dispute letter, Plaintiff provided Trans Union a copy of her police report, driver's license, and social security card. Trans Union received Plaintiff's Third Dispute on November 3, 2025, and thereafter forwarded same to Defendant.

72. On or about October 29, 2025, Plaintiff sent a third dispute letter to Experian ("**Third Experian Dispute**"). In this letter, Plaintiff reiterated that she had been the victim of identity theft and that the Account was a fraudulent account opened in her name without her knowledge or permission. With her dispute letter, Plaintiff provided a copy of the police report she filed regarding the theft of her identity and a copy of her driver's license. Experian received Plaintiff's Third Dispute on November 4, 2025, and thereafter forwarded

same to Defendant.

73. On or about October 29, 2025, Plaintiff sent a third dispute letter to Equifax ("**Third Equifax Dispute**"). In this letter, Plaintiff again disputed the Account as fraudulently opened in her name without her knowledge or permission. With her dispute letter, Plaintiff provided Equifax another copy of her driver's license and social security card, as well as a copy of the police report she filed regarding the Account. Equifax received Plaintiff's Third Dispute on October 31, 2025, and thereafter forwarded same to Defendant.

74. On or about November 2, 2025, Defendant sent a new Account statement to Plaintiff reporting a balance of $10,556.41, a minimum payment due of $962.14 and a payment due date of November 27, 2025. The statement also noted, "This statement is for information purposes only. This is not a bill. Please contact your collections agency for account information. Disregard the Minimum Payment Due, your Account is in default and the balance is due in full."

75. At the time Defendant sent the Account statement, Defendant knew the entire Account and balance was disputed as fraudulent.

76. On or about November 4, 2025, Plaintiff received the results of Trans Union's investigation into her third dispute, wherein Trans Union informed Plaintiff that it had deleted the Account from Plaintiff's credit report. With the investigation results, Trans Union provided Plaintiff with a copy of her credit report which confirmed the Account was finally removed from her Trans Union credit report.

77. On or about November 4, 2025, Plaintiff received the results of Experian's investigation into her third dispute, wherein Experian informed Plaintiff that it had deleted

the Account from Plaintiff's Experian credit report.

78. On or about December 2, 2025, Defendant sent a statement to Plaintiff reporting a balance of $10,556.41, a minimum payment due of $1,185.32 and a payment due date of December 27, 2025. The statement also noted, "This statement is for information purposes only. This is not a bill. Please contact your collections agency for account information. Disregard the Minimum Payment Due, your account is in default and the balance is due in full."

79. At the time Defendant sent the Account statement, Defendant knew the entire Account and balance was disputed as fraudulent.

80. On or about March 18, 2026, Defendant sent Plaintiff a letter stating the application she had contacted them about was submitted online. With its letter, Defendant attached an Application Information Form which contained the information allegedly provided to Defendant at the time the Account was opened.

81. On or about June 8, 2026, Defendant sent Plaintiff a letter informing Plaintiff it had reviewed its records and was unable to accept Plaintiff's claim as it had determined Plaintiff applied for the Account.

82. On or about July 9, 2026, Defendant sent Plaintiff another letter informing Plaintiff it had reviewed its records and was unable to accept Plaintiff's claim as it had determined Plaintiff applied for the Account. Defendant did not provide Plaintiff any information or documents it had allegedly reviewed to make this determination.

83. While Defendant was reporting the Account as belonging to Plaintiff on Plaintiff's Trans Union credit reports, Plaintiff's Trans Union credit report was viewed by SyncBelk,

Capital One, IBOD Company, Inc., Chase, KIN Insurance Inc., Auto Club Group, Progressive Insurance, True Auto Protection, Granite Bay Acceptance, Bank of America, SavvyMoney Inc., Syncb/TJX SO, Jefferson Capital, GEICO Insurance, Safeco Ins Auto, Liberty Mutual, and Allstate Insurance.

84. While Defendant was reporting the Account as belonging to Plaintiff on Plaintiff's Experian credit reports, Plaintiff's Experian credit report was viewed by Syncb/Belk, Bank of America, BWell Now/DMS, Capital One Financial, Caro Federal Credit Union, Credit One Bank, Ginnys/DM Services, LexisNexis/INS/P&C; LexisNexis/INS/State Farm, LN/AAA Michigan, ML/SAFE FCU, Montgomery Ward/DM Serv, Progressive Insurance, Seventh Avenue/DM Servi, TD Bank, and other third parties.

85. While Defendant was reporting the Account as belonging to Plaintiff on Plaintiff's Equifax credit reports, Plaintiff's Equifax credit report was viewed by Capital One Bank USA NA, 1st Franklin Financial Cor, Citi Cards CBNA, World Acceptance Corporation, Private LBL Retail/Citibank, Dish Network, Xactus, Verizon, and Progressive Insurance.

86. From at least June 2024, through November 2025, Defendant has reported false, libelous, inaccurate, and defamatory information regarding the Plaintiff to the CRAs, debt collectors, numerous third parties, and the public at large.

87. Defendant received at least eight (8) ACDVs from the CRAs.

88. Defendant failed to make a reasonable investigation into each and every ACDV it received regarding the Account.

89. On July 29, 2026, more than one year after it originally sued Plaintiff, Defendant finally dismissed its lawsuit against Plaintiff.

90. Defendant's knowing and repeated violations of the FCRA warrants an award of punitive damages. *See, e.g., Younger v. Experian Info. Sols. Inc.,* Case No. 2:15-cv-00952-SGC, at *30 (N.D. Ala. Mar. 21, 2019) (awarding punitive damages for repeated, willful violations of the FCRA).

**COUNT ONE**
**(Violation of the Fair Credit Reporting Act)**

91. The Plaintiff adopts the averments and allegations of paragraphs 12 through 90 hereinbefore as if fully set forth herein.

92. The FCRA was created to protect consumers from the transmission of inaccurate information about them. *Guimond v. Trans Union Credit Information Co., 45 F.3d 1329, 1333 (9th Cir. 1995).*

93. The law in this District, the Fourth Circuit, and even nationally has long ago been articulated to require a detailed and searching investigation by a furnisher when it receives a consumer's FCRA dispute through a CRA.

94. Defendant violated 15 U.S.C. §1681s-2(b) by failing to investigate the accuracy of the information reported by the Defendant to the CRAs.

95. On at least one occasion within the past two years, by example only and without limitation, Defendant violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to fully and properly investigate after receiving notice that the Plaintiff disputed the information said Defendant had provided to a CRA.

96. On at least one occasion within the past two years, by example only and without limitation, Defendant violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant

information provided by the CRAs.

97. As a result of Defendant's violations of 15 U.S.C. §1681s-2(b)(1)(A) and (B), Plaintiff suffered actual damages including, but not limited to, damage to her credit and credit reputation, lost credit opportunities, and suffered harm to her good name and standing in her community. Additionally, Plaintiff suffered anxiety, worry, fear, loss of sleep, headaches, loss of enjoyment of life, time spent trying to correct her credit reports, physical pain and sickness, frustration, humiliation, embarrassment, mental anguish, and out-of-pocket expenses. Plaintiff is entitled to actual damages in an amount to be determined by the jury.

98. Defendant completely failed and/or refused to conduct a detailed and searching inquiry as required by the FCRA. Instead, Defendant simply verified the Account each and every time it received an ACDV regarding Plaintiff's dispute of the Account as not hers and/or fraudulent.

99. The violations by Defendant were willful, rendering Defendant liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n. In the alternative, Defendant was negligent, entitling the Plaintiff to recovery under 15 U.S.C. §1681o.

100. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Defendant in an amount to be determined by a jury pursuant to 15 U.S.C. §1681n and §1681o.

**COUNT TWO**
**(Fair Credit Reporting Act)**

101. The Plaintiff adopts the averments and allegations of paragraphs 12 through 100 hereinbefore as if fully set forth herein.

102. On one or more occasions within the past two years, by example only and without limitation, Defendant violated 15 U.S.C. §1681s-2(b)(1)(C) and (D) by publishing the Defendant's inaccuracies within Plaintiff's credit files with the credit reporting agencies and by failing to correctly report results of an accurate investigation to each CRA.

103. Defendant violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to at least one CRA.

104. Defendant violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all CRAs that the reporting of the Account was inaccurate, incomplete, false, and misleading.

105. Defendant failed to add a Compliance Condition Code when responding to ACDVs received from the CRAs.

106. Defendant knew that Plaintiff disputed the subject Account on at least one occasion directly with Defendant and its agents.

107. The Plaintiff's disputes were, at a minimum, *bona fide*.

108. As a result of Defendant's violations of 15 U.S.C. §1681s-2(b)(1)(C) and (D), the Plaintiff has suffered and will continue to suffer actual damages including, but not limited to, damage to her credit and credit reputation, lost credit opportunities, and suffered harm to her good name and standing in her community. Additionally, Plaintiff suffered anxiety, worry, fear, loss of sleep, headaches, loss of enjoyment of life, time spent trying to correct

her credit reports, physical pain and sickness, frustration, humiliation, embarrassment, mental anguish, and out-of-pocket expenses. Plaintiff is entitled to actual damages in an amount to be determined by the jury.

109. The violations by Defendant were willful, rendering Defendant liable for punitive damages in an amount to be determined by the jury pursuant to 15 U.S.C. §1681n. In the alternative, Defendant was negligent, entitling the Plaintiff to recovery under 15 U.S.C. §1681o.

110. The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees, pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT THREE
## (Defamation, Libel, and Slander)

111. The Plaintiff adopts the averments and allegations of paragraphs 12 through 110 hereinbefore as if fully set forth herein.

112. Within the two years prior to the filing of this Complaint, Defendant willfully, wantonly, recklessly and/or maliciously published and communicated false and defamatory statements regarding Plaintiff to third parties and the public at large. Said statements harmed Plaintiff's reputation and caused Plaintiff physical sickness, mental anguish, and emotional distress.

113. Said communications were false in that Plaintiff was not indebted to Defendant. Plaintiff did not owe any balance on the Account the subject of this action as said Account was fraudulently opened in her name.

114. Said false and defamatory statements have harmed the reputation of Plaintiff and/or

deterred third persons from associating with Plaintiff. While Defendant reported the fraudulent Account as belonging to Plaintiff on her credit reports, said information was provided to and/or viewed by numerous third parties as set out above and Plaintiff suffered damages as a result.

115. Defendant also communicated to debt collectors, third parties, and the public at large false information concerning Plaintiff, disseminating and imputing false and misleading credit worthiness information concerning Plaintiff, including but not limited to reporting that Plaintiff owed the Account the subject of this action and suing her in state court to collect on an Account Defendant knew was fraudulent.

116. At the time said communications were made, Defendant knew or should have known the falsity of the communications or recklessly disregarded the potential inaccuracy of the information, yet knowingly, willfully, and maliciously communicated the falsity.

117. As a result of Defendant's intentional communications to third parties of the false information, Plaintiff was caused to suffer injury to her reputation in the eyes of her community and the public at large, and was forced to endure years of Defendant reporting the Account to her credit reports in spite of the fact that Plaintiff did not owe the Account as it was fraudulently opened in her name without her knowledge or permission.

118. As a proximate consequence of said defamation, libel and slander, the Plaintiff suffered damage to her credit and credit reputation, lost credit opportunities, and was afraid to apply for credit. Additionally, Plaintiff suffered anxiety, worry, fear, loss of sleep, headaches, loss of enjoyment of life, time spent trying to correct her credit reports, physical pain and sickness, frustration, humiliation, embarrassment, mental anguish, and out-of-

pocket expenses, for which she seeks compensatory and punitive damages.

**COUNT FOUR**
**(Intentional Infliction of Emotional Distress)**

119. The Plaintiff adopts the averments and allegations of paragraphs 12 through 118 hereinbefore as if fully set forth herein.

120. Defendant intentionally and/or recklessly inflicted severe emotional distress on Plaintiff or should have been substantially certain that such distress would result from its conduct when it committed the above-alleged conduct.

121. The conduct of Defendant was extreme, outrageous, and exceeded the bounds of decency. Defendant's actions are the sole reason Defendant's tradeline was reporting as a negative on Plaintiff's credit report.

122. The conduct of Defendant must be regarded as utterly intolerable in a civilized society.

123. The actions of Defendant caused Plaintiff to suffer severe emotional distress.

124. The distress suffered by Plaintiff was so severe that no reasonable person could be expected to endure it.

125. As a result of Defendant's conduct, Plaintiff has been made to suffer severe emotional distress, worry, anxiety, fear, loss of sleep, headaches, loss of enjoyment of life, physical pain and sickness, frustration, humiliation, embarrassment, and mental anguish.

126. Plaintiff is entitled to actual and punitive damages for Defendant's intentional infliction of emotional distress.

**COUNT FIVE**
**(Negligent Training and Supervision)**

127. The Plaintiff adopts the averments and allegations of paragraphs 12 through 126 hereinbefore as if fully set forth herein.

128. Defendant knew or should have known of the conduct set forth herein which was directed at and visited upon Plaintiff.

129. Defendant knew or should have known that said conduct was improper and in violation of the Fair Credit Reporting Act and the laws of the State of South Carolina.

130. Defendant negligently failed to train and supervise its agents and employees in order to prevent said improper and unconscionable conduct.

131. Defendant negligently failed to train and supervise its agents and employees on the Fair Credit Reporting Act and South Carolina common law.

132. As a result of Defendant's negligence, Plaintiff suffered out-of-pocket losses, was forced to incur attorney's fees, suffered severe emotional distress, worry, anxiety, fear, loss of sleep, headaches, loss of enjoyment of life, physical pain and sickness, frustration, humiliation, embarrassment, and mental anguish.

**COUNT SIX**
**(Reckless and Wanton Training and Supervision)**

133. The Plaintiff adopts the averments and allegations of paragraphs 12 through 132 hereinbefore as if fully set forth herein.

134. Defendant knew or should have known of the conduct set forth herein which was directed at and visited upon Plaintiff.

135. Defendant knew or should have known that said conduct was improper and in

violation of the Fair Credit Reporting Act and the laws of the State of South Carolina.

136. Defendant recklessly and wantonly failed to train and supervise its agents and employees in order to prevent said improper and unconscionable conduct.

137. Defendant recklessly and wantonly failed to train and supervise its agents and employees on the Fair Credit Reporting Act and South Carolina common law.

138. As a results of Defendant's reckless and wanton conduct, Plaintiff suffered out-of-pocket losses, was forced to incur attorney's fees, suffered severe emotional distress, worry, anxiety, fear, loss of sleep, headaches, loss of enjoyment of life, physical pain and sickness, frustration, humiliation, embarrassment, and mental anguish.

**AMOUNT OF DAMAGES DEMANDED**

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands a judgment against Defendant for the following:

A. Actual and statutory damages from Defendant pursuant to 15 U.S.C. §1681n(a)(1)(A) and/or 15 U.S.C. §1681o(a)(1);

B. Punitive damages from Defendant pursuant to 15 U.S.C. §1681n(a)(2);

C. Compensatory and punitive damages in an amount to be determined by a struck jury for Defendant's Defamation, Libel and Slander of Plaintiff, Infliction of Emotional Distress, Negligent Training and Supervision, and Reckless and Wanton Training and Supervision;

E. Costs and reasonable attorney's fees from Defendant pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2);

F. For this matter to be heard by a jury; and

G. For such other and further relief as the Court may deem just and proper

*s/ Penny Hays Cauley*
Penny Hays Cauley, Fed. ID No. 10323
Attorney for Plaintiff

**OF COUNSEL:**
HAYS CAULEY, P.C.
1303 West Evans Street
Florence, SC 29501
(843) 665-1717
phc917@hayscauley.com

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS**

*s/ Penny Hays Cauley*
Of Counsel

**DEFENDANT TO BE SERVED VIA PROCESS SERVER:**
American Express National Bank
c/o Stephen J. Squeri, CEO
115 West Towne Ridge Parkway
Sandy, Utah 84070